**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Aperion Care Peoria Heights, LLC,<br>an Illinois limited liability company<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS DEPARTMENT OF PUBLIC HEALTH, an Illinois state regulatory agency, acting on behalf of XAVIER BECERRA, Secretary of the U.S Department of Health and Human Services,<br><br>Defendant. | ) | Case No.: 1:24-cv-01207<br><br>Judge Kennelly |

**APERION CARE PEORIA HEIGHTS, LLC'S**
**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Aperion Care Peoria Heights, LLC ("Peoria Heights"), by and through its attorneys of Gutnicki LLP, and for its First Amended Complaint for Declaratory Judgment, states as follows:

**JURISDICTION AND VENUE**

1. This matter was removed from the Circuit Court of Cook County (2024CH00793), and this Court has jurisdiction pursuant to 28 U.S.C. §1442(a).

2. Venue is proper in this Court pursuant to 42 U.S.C. § 1391(g).

3. This Complaint is being brought for a declaratory judgment pursuant to 28 U.S.C. § 220 and/or 735 ILCS 5/2-701.

**THE PARTIES**

4. Peoria Heights is an Illinois limited liability company organized and existing under the laws of the State of Illinois, with a principal place of business located at 1629 E

Gardner Ln, Peoria Heights, Illinois 61616. Peoria Heights is the operator of a skilled nursing facility located at the same address (the "Facility").

5. The Defendant, the Department of Health and Human Services ("HHS") is the umbrella federal agency encompassing the Centers for Medicare and Medicaid Services ("CMS"). CMS is a governmental agency responsible for the oversight of healthcare providers and enforcement of applicable laws and regulations of Medicare and Medicaid. Its regional office is located at 7500 Security Boulevard, Baltimore, Maryland 21244.

## FACTUAL BACKGROUND

### A. The IDPH's Survey and Enforcement Regime

6. The Illinois Department of Public Health ("IDPH") has a cooperative agreement with CMS, which authorizes the IDPH to conduct certification and complaint surveys to ensure that facilities receiving Medicare and Medicaid funding abide by applicable federal regulations. In this capacity, the IDPH is tasked with survey and enforcement of federal laws and regulations at the behest and direction of CMS. The foregoing responsibilities include oversight and administrative law enforcement over the Facility.

### B. Immediate Jeopardy and Its Significant Negative Effects on a Facility

7. As part of these responsibilities, if the IDPH survey team finds any instances of noncompliance during a survey, it is authorized to institute an enforcement action against the nursing facility, which includes, among other penalties, the levying of civil monetary penalties.

8. There are generally four categories of penalties based on the scope and severity of any particular alleged deficiency, with penalties increasing accordingly. The most severe level is Level 4 – Immediate Jeopardy. This means that the IDPH believes there was alleged noncompliance resulting in immediate jeopardy to resident or employee health or safety in which

immediate corrective action is necessary because the provider's noncompliance with one or more of the applicable requirements has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident receiving care in a facility or an employee of the facility.[1]

9. It is especially deleterious to a facility for the survey team to make an immediate jeopardy call, as the related civil monetary penalties increase dramatically. Specifically, an immediate jeopardy call can trigger penalties of $3,050–$10,000 per day of noncompliance, while a non-immediate jeopardy call can trigger penalties of only $50-$3,000 per day of noncompliance. 42 CFR § 488.438(a).

10. An immediate jeopardy call also significantly increases the likelihood of a facility being placed on the Special Focus Facility ("SFF") program list. The SFF list is published by CMS each month and highlights nursing homes CMS believes has poor track records on their health inspections and surveys. Facilities on the SFF list receive increased oversight, more frequent inspections and improvement goals that must be met within certain timeframes, or the facility risks being shut down.[2]

11. Furthermore, an immediate jeopardy call negatively impacts a facility's Five-Star Quality Rating System. This system was created to help consumers, their families, and caregivers compare nursing homes more easily and identify facilities with better and worse ratings.[3] Negative survey results published on Form CMS-2567s will negatively impact the reputation and rating of the subject facility. This may drive untold numbers of individuals away from the facility who otherwise would use it.

---

[1] *See* CMS Nursing Home Enforcement FAQ, available at: https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationEnforcement/Downloads/NH-Enforcement-FAQ.pdf

[2] *See* CMS Special Focus Facility ("SSF") Initiative background, available at: https://www.cms.gov/medicare/provider-enrollment-and-certification/certificationandcomplianc/downloads/sffbackground.pdf

[3] *See* https://www.cms.gov/medicare/health-safety-standards/certification-compliance/five-star-quality-rating-system, and https://www.medicare.gov/care-compare/

12. After a CMS-2567 is issued, facilities receive penalty notices ("Penalty Notice") that often explain the owed monetary penalties along with an interim suspension of Nurse Aide Training and Competency Evaluation. Ultimately, this prohibits nursing staff at the facility from getting adequately trained and thus not providing the correct standard of care.

13. Given the severity of an immediate jeopardy call, landlords of a facility typically have significant contractual penalties that are triggered if the facility receives an immediate jeopardy call.

14. Indeed, with respect to Peoria Heights, its own Lease Agreement considers an immediate jeopardy call that is not timely cured or abated to be an Event of Default, which contractually entitles its landlord to terminate the Lease Agreement and/or otherwise end Peoria Height's leasehold interest.[4] If exercised, such a termination would significantly risk the health, safety, and well-being of the residents at the Facility.

15. Moreover, any extended survey conducted as a result of an alleged finding of substandard quality of care – whether at the immediate jeopardy level or not – automatically prohibits the subject facility from conducting nurse aid training and competency evaluation programs ("NATCEP") by, or in, the facility. Social Security Act, §§ 1819(f)(2)(B) and 1919(f)(2)(B).

16. In practice, a facility's NATCEP loss legally prevents that facility from providing its very own nursing staff with on-site training in the critical clinical services necessary to maintain the highest levels of care for the facility's residents.

[4] A copy of the Lease Agreement is included as Exhibit A to Peoria Height's Motion for Temporary Restraining Order, being filed contemporaneously with this Complaint. *See* Sections 12.1(k), 12.2, and 20.3(e) therein.

17. In short, any immediate jeopardy call and its concomitant penalties would have disastrous monetary, reputational, operational, and public interest effects on any skilled nursing facility, including Peoria Heights.

**C. The IDPH's December 13, 2023, Initial Survey of Peoria Heights**

18. On December 13, 2023, the IDPH conducted an initial review and enforcement survey of the Facility on behalf of CMS (the "Initial Survey"). During this survey, the IDPH survey team found instances of alleged noncompliance.

19. Standard practice after any such survey is to provide the nursing facility with a summary of the survey's preliminary findings of alleged noncompliance, known as an "Exit Conference" and its corresponding summary. The Exit Conference and its summary are intended to provide the nursing facility with advance notice of what ultimately will be included in the survey team's subsequent formal notice of findings. This formal notice is known as a "Statement of Deficiency" and is put on the Form CMS-2567. After Form CMS-2567 is published, the facility receives the Penalty Notice consisting of the penalties the facility is to endure.

20. The Exit Conference summary from the December 13, 2023 Initial Survey (the "December 13 Exit Conference Summary"), which lists the alleged bases for the findings of noncompliance during the survey team's inspection of Peoria Heights, is attached hereto as **Exhibit A**.

21. Notably, there is **NO** finding of immediate jeopardy on the December 13 Exit Conference Summary. (*See id*.)

**D. The IDPH's January 4, 2024 Extended Survey of Peoria Heights**

22. On January 4, 2024 – twenty-two (22) days after the Initial Survey – the IDPH survey team returned to Peoria Heights to conduct an extended survey (the "Extended Survey").

The survey team indicated that they would be issuing an immediate jeopardy citation for the alleged noncompliance found during the December 13, 2023 survey. (*See* Affidavit of Angela Campbell, ¶ 3, attached hereto as **Exhibit B**.)

23. The survey team indeed issued an immediate jeopardy call for the alleged noncompliance found during the December 13, 2023 survey, effective from December 13, 2023 until abated on January 4, 2024. The survey team left a copy of the Exit Conference summary dated January 8 (the "January 8 Exit Conference Summary") at the Facility. A copy of the January 8 Exit Conference Summary is attached hereto as **Exhibit C**.

24. The January 8 Exit Conference Summary states expressly that the IDPH considered the January 4 survey an "Immediate Jeopardy/Extended Survey." (*Id*.)

25. The survey team also updated the December 13 Exit Conference Summary to reflect their alleged findings and determination during the January 4 Extended Survey and January 8 Exit Conference Summary, including the alleged immediate jeopardy call. (*See* Ex. A December 13 Exit Conference Summary, handwritten notes made on "1/04/24.")

**E. CMS's Failure to Follow the State Operations Manual § 7210.5.**

26. Peoria Heights adamantly denies CMS and IDPH's survey findings and proposed penalties, including but in no way limited to the allegations in the December 13 Exit Conference Summary and those in the January 8 Exit Conference Summary.

27. However, most critically, the Extended Survey immediate jeopardy call made during the January 4 Extended Survey was facially procedurally improper and impermissible.

28. To wit: CMS's State Operations Manual (the "SOM") is issued directly by CMS and provides the rules and guidance for the teams conducting surveys for CMS, including the

IDPH.[5] The SOM for nursing home surveys specifically states that the SOM "implements the nursing home survey, certification, and enforcement regulations at 42 CFR Part 488. No provisions contained in this chapter are intended to create any rights or remedies not otherwise provided in law or regulation." (SOM, p. 1.) In other words, according to CMS itself, the intent of the SOM is to fulfill all governing regulatory mandates.

29. Section 7210.5 of the SOM states unequivocally that:

> **An extended** or partial extended **survey** should be conducted **<u>immediately</u>** after the standard or abbreviated standard survey, but, **if delayed, <u>not later than 14 calendar days</u> after completion of a standard survey** or abbreviated standard survey which found that the facility had furnished substandard quality of care.

(SOM, p. 36, § 7210.5) (emphasis added.)

30. In the present case, the IDPH survey team of Peoria Heights conducted their standard survey on December 13, 2023, wherein they found the alleged noncompliance based on substandard quality of care. (*See* Ex. A.)

31. Thus, per SOM § 7210.5, any extended survey was required to be conducted **<u>immediately</u>** after the December 13 survey, **<u>but in no event later than 14 days thereafter</u>** (i.e., December 27, 2023).

32. In this case, however, the survey team did their extended survey on January 4, 2024, **<u>eight (8) days too late</u>**. Therefore, conducting this extended survey itself, as well as the call of immediate jeopardy it made, was facially procedurally improper and impermissible.

33. In fact, Peoria Heights' Director of Nursing personally notified the survey team of this procedural impropriety and impermissibility when the team arrived on January 4 to do the Extended Survey. However, the IDPH simply responded that the 14-day limitation "did not apply" in Peoria Height's case. Indeed, contrary to the express 14-day limitation mandated by

[5] The SOM is available at:
https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/som107c07pdf.pdf

the SOM, the IDPH unilaterally conducted the Extended Survey and issued the immediate jeopardy citation. (*See* Ex. B, Aff. of A. Campbell, ¶¶ 3-6.)

34. To be clear: neither the SOM nor its overarching regulations (at 42 CFR Part 488) provides CMS with the permission simply to "not apply" the 14-day limitation in their own survey procedures. Rather, any extended survey of Peoria Heights – expressly and without exception – had to occur within 14 days of the standard survey on December 13. That did not happen.

**CAUSE OF ACTION**

**Count I – Declaratory Judgment**

35. Peoria Heights incorporates by reference the allegations of paragraphs 1 through 34 above as fully alleged herein.

36. Peoria Heights seeks a declaratory judgment under 28 U.S.C. §2201 and/or 735 ILCS 5/2-701 because CMS violated § 7210.5 of the SOM.

37. In this case, Peoria Heights has a tangible, legal interest, namely, its monetary, standard of care, and operational interests.

38. CMS has an opposing interest, namely, the levying of monetary Nurse Aide Training against Peoria Heights based on its immediate jeopardy call in its December 13 Initial Survey and its January 4 Extended Survey.

39. An actual controversy presently exists between Peoria Heights and the CMS, namely whether the January 4 Extended Survey was procedurally proper and/or permissible given the requirements of the SOM and applicable law.

40. This controversy should be fully resolved in Peoria Heights' favor: SOM § 7210.5 expressly requires that any extended survey be conducted immediately after the initial survey,

but in no event later than 14 days thereafter. However, the CMS survey team did the January 4 Extended Survey 22 days after the Initial Survey of December 13, 2023, which was 8 days too late. Conducting this extended survey itself, as well as the call of immediate jeopardy it made, was thereby facially procedurally improper and impermissible.

**CONCLUSION**

WHEREFORE, based on the facts and legalities stated herein, Aperion Care Peoria Heights, LLC prays that this Court enters a declaratory judgment determining that the CMS's January 4 Extended Survey was procedurally improper and/or impermissible, and that any and all related findings and penalties are null and void, along with any and all other relief that this Court deems just and merited.

Dated: March 8, 2024

Respectfully submitted,

*/s/ Aharon S. Kaye*
Attorney for Aperion Care
Peoria Heights, LLC

Aharon S. Kaye (Attorney No. 6291684)
Noah Siegel (Attorney No. 6327603)
Emily Shapiro (Attorney No. 6346485)
GUTNICKI LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
T: (847) 745-6594
E: akaye@gutnicki.com

# EXHIBIT A

# EXIT CONFERENCE

FACILITY Aperion Care of Peoria Heights EXIT DATE 12/13/2023

SURVEY TYPE Licensure,Certification,complaint x2 23210132 and 23210014

FACILITY STAFF PARTICIPATING (List names/titles of all participants)

CHECK IF PRESENT: X ADMIN X DON __ ADON __SOCIAL SERVICE

__OTHER (Identify)

PRELIMINARY SURVEY TEAM FINDINGS

Concerns with Pasarr re-screen, Revising careplans, unwanted care given, Investigate and prevent falls

Diets not met-not giving the appropriate diet, No dietary staff, Lacking dietary staff

Serving cold food No substitute, Not giving substitutes, not giving special diets

Sanitation issues, Garbage issues, Inaccurate medical records

QA did not have the required staff- No tracking for washer /dryers, no hand hygiene during medication pass.

No facility mask fitting. Issues with Advance Directives, Concerns with cut letters, Concerns with facility grievances.

Resident to resident abuse, Concerns with missing laundry.

reporting abuse, investigating an abuse,notice to Ombudsman,and Bed hold.

This Exit is pulled today, 1/04/24 due to Regional determination for Immediate Jeopardy.
[signature], HFS

[signature] Campbell RN/DON

FACILITY PRESENTED DOCUMENTATION FOR REVIEW DURING COURSE OF SURVEY? ☐ X Yes ☐ No

MATERIAL REVIEWED ON SITE BY THE SURVEY TEAM? ☐ X Yes ☐ No

Elia Sall RN HFSN
TEAM COORDINATOR SIGNATURE

[signature]
FACILITY REPRESENTATIVE SIGNATURE

The Exit Conference is the first step of the Informal Dispute Resolution (IDR) process. The facility has the right to request a further review of their evidence of compliance by requesting an IDR with Springfield Central Office.

The purpose of the Exit Conference during the onsite survey is to informally communicate preliminary survey team findings and provide an opportunity for the exchange of information with the provider. The Exit Conference informs the provider of the survey team's observations and potential findings, allowing the provider to plan ahead of the formal receipt of the survey findings in the CMS-2567, Statement of Deficiencies.

Date/Time IJ Template provided to entity: Aperion of Peoria Heights---1/04/24 9:50 AM---------------------------------------------------------

| IJ Component | Yes/No | Preliminary fact analysis which demonstrates when key component exists. |
|---|---|---|
| **Noncompliance:** Has the entity failed to meet one or more federal health, safety, and/or quality regulations?<br><br>If yes, in the blank space, identify the tag and briefly summarize the issues that lead to the determination that the entity is in noncompliance with the identified requirement. This includes the action(s), error(s), or lack of action, and the extent of the noncompliance (for example, number of cases). Use one IJ template for each tag being considered at IJ level. | Yes/No | Yes F812 beverage drip trays, grease trays, microwave oven, large containers steam table area; label and date food products for refrigerated foods and dry goods; place raw meat under ready to eat food or food ingredients; put raw meat in leak proof pans; consistently check the level of Quaternary Ammonia in the sanitation buckets; keep food off of the floor of the walk-in refrigerator and walk-in freezer; place thermometers inside the walk-in refrigerator and walk-in freezer; keep dished up food in the cooler; have dishes/silverware so that dust/grime cannot reach the serving area of the dish/silverware. These failures have the potential to affect all 82 residents living in the facility. |
| | **AND** | |

aCampbell RN/DON

## Immediate Jeopardy Template

Survey teams must use the Immediate Jeopardy (IJ) Template to document evidence of each component of IJ; and if IJ is confirmed, the IJ Template will be used to convey information to the entity. Any information presented on this template is subject to change and does not reflect an official finding against a Medicare provider or supplier. **Form CMS-2567 is the only form that contains official survey findings.**

**Instructions**: The survey team must use evidence gathered from observations, interviews, and record reviews to carefully consider each component of IJ outlined in the left-hand column of this template. In order for IJ to exist, the survey team must answer "Yes" to all three components and provide a preliminary fact analysis in the right hand column to support their determination. If IJ is confirmed by the survey team and SA Supervisor, provide this IJ Template to the entity and note the date and time that it was provided at the top of page 2. Use one IJ template for each tag being considered at IJ level.

For the purpose of completing this template, the following definitions apply:

**Likely/Likelihood** means the nature and/or extent of the identified noncompliance creates a reasonable expectation that an adverse outcome resulting in serious injury, harm, impairment, or death will occur if not corrected.

**Noncompliance** means failure to meet one or more federal health, safety, and/or quality regulations.

**Recipient at Risk** is a recipient who, as a result of noncompliance, and in consideration of the recipient's physical, mental, psychosocial or health needs, and/or vulnerabilities, is likely to experience a serious adverse outcome.

**Serious injury, serious harm, serious impairment or death** are adverse outcomes which result in, or are likely to result in:

- death; or
- a significant decline in physical, mental, or psychosocial functioning, (that is not solely due to the normal progression of a disease or aging process); or
- loss of limb, or disfigurement; or
- avoidable pain that is excruciating, and more than transient; or
- other serious harm that creates life-threatening complications/conditions.

***NOTE: IJ does not require serious injury, harm, impairment or death to occur. It is sufficient that non-compliance makes serious injury, harm, impairment or death likely to occur to one or more recipients.**

| | | |
|---|---|---|
| **Serious injury, serious harm, serious impairment or death:**<br>Is there evidence that a serious adverse outcome occurred, or a serious adverse outcome is likely as a result of the identified noncompliance?<br><br>If Yes, in the blank space, briefly summarize the serious adverse outcome, or likely serious adverse outcome to the recipient. | Yes/No | YesThe kitchen had the following deficiencies which may cause food borne illness: On 12/10/23 at 10:10 AM. The convection oven had dust wads on the top of the appliance and a build up of black grease, grime and food particles/crumbs on both the ledge on the outside of the oven and on the inside bottom of the oven. The windows on the oven were opaque with a layers of build up grease. The pipes behind the convection oven were covered in cobwebs. The range has dried food splatters on the burners and on the back splash area. A drip pan on the side of the range was full of grease, some older layers that smelled rancid. The drip tray located under the burners had a build up of dried splashes, unknown food particles/chunks, grease and dust. The range and oven had dried food particles and grease burned on the bottom inside of the oven. The outside/front of the appliances had splashes of dried food/smears. The food preparation table across from the range has plates stored on a shelf underneath that are not upside down to prevent being exposed to dust/contaminants. Silverware and kitchen utensils do not have a cover over them to prevent contamination. The counter had a ham sitting in a pan uncovered. The cooks purse and personal drink container was sitting next to the pan. The area above the steam table and under the shelf to the dining room is full of old dried food splashes . The handwashing sinks all needed to be scoured/cleaned. One handwashing sink did not have soap in the soap dispenser, another handwashing sink did not have paper towels in the paper towel machine. The electrical boxes and the pipes on the ceiling have a layer of dust/grime by the food preparation table and by the beverage table. Another personal drink container was sitting on the beverage table. A rack holding two trays of fruit cocktail was sitting next to the walk in refrigerator. No one could tell when this had been made or how long it had been sitting out of the refrigerator. (possibly form a meal two days prior). The walk in refrigerator had five crates of milk and one crate of juice concentrate sitting on the floor. The second shelf held four ten pound tubes of raw hamburger, unopened and one tube of raw hamburger, opened with 50 % used, no |

| AND | | |
|---|---|---|
| **Need for Immediate Action:**<br>Does the entity need to take immediate action to correct noncompliance that has caused or is likely to cause serious injury, serious harm, serious impairment, or death?<br><br>If yes, in the blank space, briefly explain why. | Yes/No | Yes 1.Educate staff on proper hand washing and glove usage. 2.Enforce a daily, weekly, and monthly cleaning schedule. This includes both small and large appliances; walk-in refrigerator; walk-in freezer; range; ovens under the range; drip pan under the range; grill; grease pan beside the grill; convection oven; microwave oven; large mixer; can opener; exterior of all appliances; handwashing sinks; the steam table area; beverage machine drip pans; bulk containers in the dry storage room; walls, floors, ceilings, pipes. 3.Record food temperatures at each meal on the facility form. 4.Record Dishwasher Temperature and Chlorine Parts Per Million on the facility form. 5.Record Sanitation Bucket Quaternary Ammonia Parts Per Million on the facility form. 6.Educate staff on Sanitation requirements for the kitchen; thermometers in all refrigerators and freezers; personal items of staff (purses, drink containers, etc...) are not kept where food is prepared, stored. 7.Proper food storage in the Walk-in Refrigerator: placing raw food under ready-to eat foods; putting raw food in drip proof containers; putting a label on all foods which includes an open date; disposing of all outdated food; no food items on the floor. 8.Proper food storage in the Walk-in Freezer: no food items on the floor; opened items have a label and date. |

Disclaimer: The findings on this IJ Template are preliminary and do not represent an official finding against a Medicare provider or supplier. Form CMS-2567 is the only form that contains official survey findings.

# EXHIBIT B

# AFFIDAVIT

STATE OF ILLINOIS

COUNTY OF COOK

**BEFORE ME** personally appeared Angela Campbell, who, being by me duly sworn, deposed as follows:

1. My name is Angela Campbell. I am over the age of 18 years, have never been convicted of a felony, am fully competent to make this Affidavit and testify herein, have personal knowledge of the facts stated herein, and know them to be true and correct.

2. I am employed as the Director of Nursing at the Peoria Heights skilled nursing facility located at 1629 E Gardner Ln, Peoria Heights, Illinois 61616.

3. On January 4, 2024, the IDPH state surveyor, Anita, arrived at Peoria Heights to conduct an extended survey. I went to the conference room to meet her. She informed me that she was there to issue an immediate jeopardy citation for the noncompliance found during the initial survey. This initial survey had been conducted on December 13, 2023, and we had held the Exit Conference for it on the same day. January 4, 2024 was twenty-two (22) days thereafter.

4. Given the timing, I asked her how the IDPH could return to conduct an extended survey and issue an immediate jeopardy citation, as the State Operations Manual required the survey team to do so no later than fourteen (14) days after the initial survey.

5. Anita checked with her supervisors and requested that I call Ginny Pibble at the IDPH to clarify the IDPH's position.

6. I called Ginny Pibble and raised the 14-day limitation based on the State Operations Manual. She responded that the 14-day requirement "did not apply" to Peoria Height's particular situation, and indicated they would be issuing the immediate jeopardy citation.

Further Affiant Sayeth Not

Angela Campbell

Angela Campbell

Subscribed and sworn to before me on this 6th day of February, 2024, to certify which, witness my hand and seal of office:

Beth R Broyles

Notary Public in and for the State of Illinois
Print Name: Beth R Broyles
My Commission Expires: 12-09-2025

OFFICIAL SEAL
BETH R. BROYLES
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 12-09-2025

# EXHIBIT C

# EXIT CONFERENCE

FACILITY Aperion Care Peoria Heights EXIT DATE 1/08/24

SURVEY TYPE Imediate Jeopardy/Extended Survey

FACILITY STAFF PARTICIPATING (List names/titles of all participants)

CHECK IF PRESENT: X ADMIN X DON __ ADON __SOCIAL SERVICE

__XOTHER (Identify) Corporate Staff

PRELIMINARY SURVEY TEAM FINDINGS

The facility is following the approved abatement plan. No issues. The Immediate Jeopardy is lifted per 1/04/24.

FACILITY PRESENTED DOCUMENTATION FOR REVIEW DURING COURSE OF SURVEY? **X** ☐ Yes ☐ No

MATERIAL REVIEWED ON SITE BY THE SURVEY TEAM? **X** ☐ Yes ☐ No

Anita Morgan, RD, LD, HFS
TEAM COORDINATOR SIGNATURE

R. Maddalozzo, RN
FACILITY REPRESENTATIVE SIGNATURE

The Exit Conference is the first step of the Informal Dispute Resolution (IDR) process. The facility has the right to request a further review of their evidence of compliance by requesting an IDR with Springfield Central Office.

The purpose of the Exit Conference during the onsite survey is to informally communicate preliminary survey team findings and provide an opportunity for the exchange of information with the provider. The Exit Conference informs the provider of the survey team's observations and potential findings, allowing the provider to plan ahead of the formal receipt of the survey findings in the CMS-2567, Statement of Deficiencies.